IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRAY JIBRIL MURRAY,      :
        Plaintiff,     :    1:17-cv-1637
                    :
    v.          :    Hon. John E. Jones III
                    :
SECRETARY JOHN E WETZEL, :
*et al.*,                  :
        Defendants.   :

## **MEMORANDUM**

### **March 29, 2021**

Plaintiff, Bray Jibril Murray ("Murray"), a state inmate in the custody of the Pennsylvania Department of Corrections ("DOC"), formerly housed at the State Correctional Institution at Dallas ("SCI-Dallas"), filed the instant action pursuant to 42 U.S.C. § 1983, on September 12, 2017, alleging that, in exposing him to secondhand tobacco smoke and failing to adequately treat him for such exposure, Defendants violated his Eighth Amendment rights.  Murray's supplemental complaint (Doc. 79) filed on August 30, 2019, is the governing complaint in this matter.

Ripe for disposition are motions for summary judgment filed by Defendant Loretta DeBoer, CNRP ("DeBoer") (Doc. 133) and Secretary John E.Wetzel ("Wetzel"), Superintendent Lawrence Mahally (" Mahally"), Deputy Superintendent Zakarauska ("Zakarauska"), Deputy Demming ("Demming"), U/M/ Bohinski ("Bohinski"), Major White ("White"), Goyne, George Miller

("Miller"), and James Marsico ("Marsico") (Doc. 135), collectively referred to as the DOC Defendants.  For the reasons set forth below, Defendants' motions will be granted.

## I.   <u>STANDARD OF REVIEW</u>

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990).  A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  *Id.*; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." *Celotex*, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out ... that there is an absence of evidence to support the nonmoving party's claims." *Id.* at 325.

Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. FED. R. CIV. P. 56; *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Wooler v. Citizens Bank*, 274 F. App'x 177, 179 (3d Cir. 2008). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323; *see also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992). "[T]he non-moving party 'may not rely merely on allegations or denials in its own

3

pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial.'" *Picozzi v. Haulderman*, 2011 WL 830331, *2 (M.D. Pa. 2011) (quoting FED. R. CIV. P. 56(e)(2)).  "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of North America. Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322.  The adverse party must raise "more than a mere scintilla of evidence in its favor" and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989). The mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. *Anderson*, 477 U.S. at 249–50.

## II.    STATEMENT OF MATERIAL FACTS[1]

On June 17, 2016, the DOC implemented Clean Indoor Air Act Policy 1.1.7, superseding all prior policies providing a smoke free environment consistent with Senate Bill No. 246 of 2007, Pennsylvania Clean Indoor Air Act.  (Doc. 140-1, p. 6).  The policy provided "[e]xcept at tobacco free facilities, smoking may be permitted only at designated outdoor locations. Proper disposal receptacles must be used."  (*Id*. at p. 11).  It also provided under the heading "Non-Compliance," that: "1.  Inmate violations will be addressed in accordance with Department policy DC-ADM 801, 'Inmate Discipline.'  Staff violations will be addressed in accordance with Department policy 4.1.1, 'Human Resources and Labor Relations.'  2.  In addition to the disciplinary action referenced in Subsection B.1. above, staff and inmates who do not comply with the smoking ban may also be subject to the administrative and/or criminal penalties provided in the Clean Indoor Air Act." (*Id.*).

On September 30, 2016, Murray submitted a DC135A Inmate Request to Defendant Bohinski complaining of the high level of tobacco smoke created in F-Unit by staff and inmates smoking "whenever and wherever" in the unit.  (Doc. 134, ¶ 8; Doc. 157, ¶ 8).  He believed the traditional cell doors constructed with

---

[1]  DeBoer and the DOC Defendants filed a joint Statement of Facts.  (Doc. 134).

bars in F-Unit did nothing to stop the smoke from entering his cell and requested a transfer to G-Unit, which had solid cell doors.  (*Id.*; *Id.*).

On October 6, 2016, he submitted a second DC135A Inmate Request addressed to Defendant White, complaining of the excessive smoking in F-Unit, referring to his prior request directed to Bohinksi and Bohinski's response explaining to Murray that G-Unit was primarily a double cell housing unit. Murray's cell status is a Z code (single-cell).  (Doc. 137-7, p. 19).  He also warned that if the issue was not resolved he would file a grievance.  (Doc. 134, ¶ 9; Doc. 157, ¶ 9).

On October 15, 2016, Murray submitted two separate identical DC135A Inmate Requests addressed to Defendants Zakarauskas and Demming, stating that he has been exposed to tobacco smoke day and night due to inmates and staff freely using smoking tobacco everywhere in F-Unit and asking if there existed a housing unit at SCI-Dallas where inmates and staff were prohibited from purchasing, possessing, or using tobacco products.  (Doc. 134, ¶ 10; Doc. 157, ¶ 10; Doc. 139-5, pp. 3-4).

Murray submitted another DC135A Inmate Request on January 5, 2017, addressed to Defendant Goyne, "complaining about the extremely high levels of second hand smoke" and detailing his efforts to informally resolve the matter and the staffs' failure to respond to his requests.  (*Id.* at 11; *Id.* at 11; *Id.* at p. 5).

On February 1, 2017, Murray wrote a letter to the Representatives of "the Pennsylvania House of General Assembly," with a copy sent to Defendant Wetzel, informing them that the use of tobacco products in the housing units at SCI-Dallas was in violation of the Clean Indoor Act, and requesting that smoking be prohibited at SCI-Dallas until the prison made proper and adequate renovations to the housing units to protect non-smoking inmates from exposure to secondhand smoke. (*Id.* at 12; *Id.* at 12; Doc. 139-9). In responding on behalf of Defendant Wetzel, on March 23, 2017, Jennifer Pawling, Staff Assistant of the Eastern Region of the DOC stated that:

> The Clean Indoor Air Act, DOC policy 1.1.7, which you referenced, does prohibit smoking in Departmental buildings. Smoking, with the exception of tobacco free facilities, is permitted at designated outdoor locations. Inmate violations should be disciplinarily addressed according to the DC-ADM 801, and staff violations are to be addressed in accordance with the DOC's Human Resources and Labor Relations policy. There are also administrative and criminal penalties associated with the Act.
>
> . . .
>
> By copy of this response, SCI Dallas Administrative staff will be apprised of your concerns. In addition, the DOC's Operations Bureau, which is primarily responsible for this area of policy, is also being included on this response.

(*Id.* at 13; *Id.* at 13; Doc. 139-10).

On March 3, 2017, Murray filed Grievance Number 668355, with the heading "Clean Indoor Air Act Violation." (*Id.* at 14a; *Id.* at 14; Doc. 139-4, p. 9). He states that since arriving at SCI-Dallas on September 22, 2017, he has been

exposed to "extraordinarily high levels of Environmental Tobacco Smoke ("ETS")" which is placing his future health at significant risk." (*Id.*; *Id.*; *Id.*).  He complains about the antiquated facility, the use of iron bar cell doors as opposed to solid cell doors, the lack of a camera system, and the fact that tobacco products are sold in the commissary.  He requested monetary compensation, injunctive relief, and punitive damages.

> The initial response dated April 3, 2017, states:
>
> If you are experiencing any health issues, I strongly recommend you sign up for sick call.
>
> All buildings at SCI-Dallas have signage stating this is a no smoking building.  Staff have been instructed on the policy and the law about the clean indoor act, which includes but is not limited to issuing a misconduct if deemed necessary.
>
> Pennsylvania Correctional Industries is in charge of the commissary list and available products for purchase, with that being said the institution does not have the ability to not sell those products.
>
> Your request[s] [for] 1,000.00 a day, preliminary injunction, designating G-unit as non-smoking and punitive damage[s] of 5,000.00 a day are rejected.

(Doc. 139-4, p. 11).

Murray appealed.  (*Id.* at 12).  Defendant Mahally found that the grievance officer adequately addressed the issue.  (*Id*. at 13).  He also recommended that Murray sign up for sick call if he was experiencing any health issues.  (*Id.*). Murray pursued the grievance to the final level, the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"), stating in part that: "Records will show, that

grievant have grieved this secondhand smoke issue before while housed at other SCI-facilities, and he have a deep-seated psychological fear and anxiety about exposure to secondhand smoke; and hence believes he should never have been sent to a SCI-facility (such as Dallas), where the level of ETS is extraordinarily high, and places grievant and all non-smoking inmates future health at grave risk." (*Id.* at 14). The SOIGA upheld the earlier responses. (Doc. 134, ¶ 14(f); Doc. 157, ¶ 14).

Murray was admitted to the infirmary on May 24, 2017, for injuries, including a stab wound and a human bite, sustained during an altercation with another inmate. (Doc. 134, ¶ 15; Doc. 157, ¶ 15). He had no respiratory complaints, his lungs were clear, and he denied experiencing chest pain or shortness of breath. He did not raise any concerns related to secondhand smoke on the housing blocks. (*Id.*; *Id.*). On May 25, 2017, while in the infirmary, he had a chest X-ray secondary to complaints of feeling lightheaded or faint, which revealed no evidence of lung disease. (*Id.* at 16; *Id.* at 16).

Murray was seen by Defendant DeBoer, in the Restricted Housing Unit ("RHU") on May 30, 2017, for removal of staples from the wound he suffered during the inmate altercation and to discuss HIV testing because of the human bite he sustained. (*Id.* at 17; *Id.* at 17). The staples were removed without incident and Murray agreed to the HIV testing. He did not raise concerns of secondhand smoke or any impact it may have been having on his health. (*Id.*; *Id.*). Nor did voice any

complaints to DeBoer regarding secondhand smoke or concerns pertaining to his respiratory health when she returned to the RHU on June 22, 2017, to advise him of his HIV test results. (*Id.* at 18; *Id.* at 18).

The following day, June 23, 2017, Murray was seen by Dr. Guy Gustitus for an Annual Preventative/Wellness visit. (*Id*. at 19; *Id.* at 19). Murray had no health complaints. (*Id*.; *Id*.).

Over a year passed with no medical encounters. (*Id.* at 20: *Id.* at 20). He had his Annual Preventative/Wellness visit on August 2, 2018, at which time he informed Defendant DeBoer that he was healthy and had no complaints. (*Id.* at 20; *Id.* at 20). The visit revealed elevated blood pressure. (*Id.*; *Id.*). All other vital signs, including his respiratory rate, were normal. (*Id.*; *Id.*).

He was next seen in the medical department on November 16, 2018, to discuss issues related to his diet. He did not raise any health concerns related to secondhand smoke. (Doc. 134, ¶ 22).

On February 4, 2019, Murray notified the medical department that he was concerned about "pervasive levels of environmental tobacco smoke (ETS)." (Doc. 134, ¶ 23; Doc. 157, ¶ 23). On his sick call slip, he wrote: "For several weeks, I have been experiencing some very serious respiratory problems in my sinuses, [headaches], burning and watery eyes, heavy phlegm or mucous in chest and sinus area. Burning sensation in throat and nostrils." (*Id.* at 23; *Id.* at 23). He did not present at sick call to be assessed. (*Id.*; *Id.*).

10

On February 6, 2019, he submitted another sick call slip, stating: "As a result of pervasive levels of environmental tobacco smoke (ETS) in I unit for several weeks, I have been experiencing weird but serious respiratory problems such as heavy congestion of mucous or phlegm in my chest and sinus areas as well as [headaches], burning sensation in my sinuses, throat and eyes." (*Id*. at 24; *Id.* at 24). He was requesting a mask to filter out the smoke. (*Id*.; *Id.*).

At sick call, Defendant DeBoer examined him and noted that his ears were clear without reddening, his nose was not swollen but contained a small amount of yellow mucous, and his lungs revealed no wheezing, rales, or rhonchi. (*Id*.; *Id.*). DeBoer asked him to perform a peak flow test, but noted that he exhibited poor effort despite repeated instructions. (*Id*.; *Id.*). His respiration rate and oxygen levels were normal. Based upon her findings, she diagnosed him with allergic rhinitis and offered to prescribe him Zyrtec. The medical progress notes reveal that he declined the Zyrtec stating: "What good will that do? I don't have allergies. I want a mask. That would help tremendously." (Doc. 139-2, p. 27). Defendant DeBoer advised him that his symptoms can be attributed to an irritative process from smoke exposure triggering mucous production as well as other symptoms. (*Id*. at 27-28). He responded: "NO that [sic] not it. I want a mask. I want them not to smoke on the block." (*Id.* at 28). DeBoer advised him that she "d[id] not have any jurisdiction in preventing other inmates from smoking as well as directing COs to stop smoking on the block" and that "medical does not issue masks for inmates

to use in their cell." (*Id.*). When he questioned why, DeBoer informed him that the medical department "is not allowed to issue masks for smoke filtration purposes." (*Id.*). She again explained the purpose of the Zyrtec and asked if he wanted the prescription. He responded, "Well I am not sure." (*Id.*). When she advised him that a decision must be made in the interest of time, he stated: "Well forget it. You did nothing for me." (*Id.*).

In her affidavit, DeBoer states "because I am not an employee of the [DOC], I have no authority or ability to enforce the [DOC's] "No Smoking Policy." (Doc. 139-11, ¶ 3). In the event that a patient presents to the medical department with symptoms believed to be caused by smoking or secondhand smoke, she is only qualified to treat the symptoms and/or the underlying disease of the patient. (*Id.* at ¶ 4). Pursuant to DOC regulations in effect at the time, and prior to COVID-19, inmates were not permitted to wear face coverings in the housing units, including medical masks. (*Id.* at ¶ 6). They could only wear medical masks while housed in the infirmary and only if they suffered from an infectious respiratory disease. (*Id.*).

The following day, Murray filed Grievance Number 786403, stating that:

> [O]n February 6, 2019, I attended sick call, and was seen by a Nurse or P/A named Loretta, regarding second hand-related respiratory problems such as: burning throat, nose and eyes; headaches; heavy mucus build-up in sinus and chest areas. After conducting a battery of simple tests, P/A Loretta diagnoses my medical problem as ETS-related allergies; and recommends allergy medication. I vigorously disagreed with the P/A's recommended treatment of my ETS-related medical problem, and requested to be examined by a specialist in excessive ETS-exposure, and also to be provided with duck-bill or a painter's

breathing mask, to wear in the housing unit only. The P/A denied my requests for duck-bill mask, etc., became very upset with me, gave me an ultimatum of accepting the allergy medication (for ETS-related medical problem), and angrily dismissed me from the triage when I declined allergy medicine. Relief sought here: I want to be examined by a ETS or indoor pollutant medical specialist, and also be provided with a duck-bill or painter's mask while housed in I-unit.

(Doc. 134, ¶ 25; Doc. 157, ¶ 25).

On February 26, 2019, Corrections Healthcare Administrator, Lea Martin

("CHCA Martin"), responded stating as follows:

As you state, on February 6, 2019, you were seen in sick call. You complained about second hand smoke and requested a mask be provided from Medical as a solution to filter out the smoke. After an assessment was performed, you were diagnosed with allergic rhinitis. You were given the option to have Zyrtec prescribed, in which you refused. Furthermore, you were infirmed that Medical is not authorized to distribute masks to inmates. The practitioner was correct in not providing you with a mask, and you were given a potential resolution to help with your medical symptoms when you were offered medication. The Medical Department cannot authorize a "smoke free block," as all housing units are deemed smoke free. If a specialist was warranted, you would have been referred to one. There has been no wrongdoing by medical personnel. Perhaps your Unit Manager can help with your housing issues.

(*Id.* at 25 (b); *Id.*).

In his appeal, Murray challenged CHCA Martin's expertise on the activities of inmates in housing units and whether they are smoke free. He also reiterated that he disagreed with the rhinitis diagnosis and stated that he refused the allergy medication because he learned through research that rhinitis may be early signs of bronchitis, "and what may very well be early stages of something far worst [sic]."

(*Id.* at 25(c); *Id.*).  Defendant Mahally responded stating, in pertinent part, that "there has been no wrong-doing by medical personnel" and "SCI-Dallas operates in accordance with policy1.1.7 Clean Indoor Air Act which prohibits smoking in any Department buildings."  (*Id.* at 25(d); *Id.*).

In his appeal to the SOIGA, Murray stated that he felt "the administrative staff of SCI-DALLAS is either in denial, complicity or deliberately indifferent  to the blatant disdain and disregard of the DC-1.1.7 Clean Indoor Air Act policy." (*Id.* at 25(e); *Id.*).  He reiterated that he was "pretty certain that his respiratory/mucus/congestion, etc., problem is early stages of Bronchitis; and perhaps something far more worst [sic]."  (*Id.*; *Id.*).  The SOIGA upheld the lower level grievance responses.  (*Id.*; *Id.*).

Murray also submitted a DC-135A, Inmate Request to Staff Member stating that he had recently been diagnosed with ETS related allergies and that the medical department denied his request to wear a mask and instructed him to direct the request to housing unit management.  (*Id.* at 26; *Id.* at 26).  He stated "I am here requesting of you, that I be provided with a duck-bill mask or painter's mask and permitted [only] to wear it while in the housing unit to minimize my exposure to ETS while in the housing unit…"  On February 19, 2019, Defendant Bohinski responded by informing him that "DocNet" did not list his ETS related allergies and, "[a]s such, there are no restrictions listed so there is nothing to approve."  (*Id.* at 26(a); *Id.*).

Murray then filed Grievance Number 789896 asserting that he did not receive a response to his request to wear a mask on the housing unit from Defendants Mahally, Miller, Bohinski or Marsico. (*Id.* at 27; *Id.* at 27).  In his grievance response, Defendant Goyne informed him that, although Defendants Mahally and Miller did not receive his request, Defendant Marsico did and forwarded it to Defendant Bohinski, who provided him with a response.  During the appeal, Defendant Mahally confirmed that neither his office nor Deputy Miller received the Inmate Request; however, he felt that Major Bohinski adequately addressed the concerns raised in the request slip.  (*Id.*; *Id.*).

On June 28, 2019, Murray filed Grievance Number 809441, claiming that Corrections Officer McCoy ("Officer McCoy") lit a cigarette in front of him that day, and then "explode[d] into a profanity lace[d] diatribe" when he told her that she would no longer be able to smoke after July 1, 2019.  (*Id.* at 28(a); *Id.* at 28).  He also identified Officer McCoy as being "the most flagrant violator of the DC-1.1.7" No Smoking Policy and that Defendant Marsico was aware of Officer McCoy's smoking but "has never stopped her."  (*Id.*; *Id.*).  The grievance was denied on August 5, 2019.  (*Id.* at 28(b); *Id.*). The grievance officer informed Murray that he interviewed Officer McCoy and she denied violating any department policy or speaking to Murray in a discourteous or unprofessional manner.  In his appeal, Murray acknowledged that since he filed his grievance, he has not seen Officer McCoy smoking.  (*Id.* at 28(c); *Id.*).

Effective June 1, 2019, tobacco products were no longer available for purchase through DOC facility commissaries in preparation for the conversion to a tobacco-free environment by July 1, 2019.  (Doc. 140-1, p. 2).  Effective July 1, 2019, all DOC facilities were converted to a tobacco-free environment.  (*Id.*).  "Tobacco products (lighters, cigars, cigarettes, pipe cleaners, filters, rolling papers, pipes, roller aprons,, rollers, and smokeless tobacco) will be considered contraband.  Inmates will no longer be permitted to use or possess tobacco products within the secure perimeter of the institution."  (*Id.*).

On July 26, 2019,  Murray was seen by Dr. Renato Diaz for his Annual Preventative/Wellness visit.  (*Id.* at 29; *Id.* at 29).  Murray had no complaints. (*Id.*; *Id.*).

On  August 6, 2019, Murray requested sick call stating that for months he had been experiencing some problem in his lungs that is symptomatic of either bronchitis or COPD.  He reported "symptoms of constant heavy mucus/sputum build up in chest area, nostrils, difficulty breathing during exertion, etc."  (Doc. 134 ¶ 30).  At sick call, he stated that he did not have a cough and his nasal discharge was clear.  (*Id.*).  He also clarified that the only time he experienced difficulty breathing was with extreme exertion such as running or playing basketball.  (*Id.*).  Defendant DeBoer examined him and noted that his ears were clear, his nose was pink with a small amount of clear mucous, and his pharynx was pink with no exudate.  (*Id.*).  She asked him to perform a peak flow, but noted that

he exhibited poor effort despite her encouragement.  (*Id.*).  His respiration rate and

oxygen levers were normal.  DeBoer reviewed Murray's electronic medical record,

and, although there was no evidence of lung disease, she ordered a chest X-ray.

(*Id.*).  The chest X-ray, which was taken on August 8, 2019, revealed no acute

radiographic evidence of acute cardiopulmonary disease.  (*Id.* at 31).

On August 19, 2019, Murray requested to be seen during sick call because

he was suffering from chronic medical problems regarding mucous build up in his

nose, throat, chest and lungs.  (*Id.* at 32).  He also requested to see his X-ray

results.  Defendant DeBoer reviewed the X-ray results with him and explained that

the films showed no evidence of pulmonary disease.  (*Id.*).

On September 28, 2019, Murray filed Grievance Number 826496, claiming

that since July 1, 2019, he has been subjected to secondhand smoke from staff and

inmates using vaping tobacco products in the housing unit.  (Doc. 134, ¶ 34; Doc.

157, ¶ 34).  He claims the exposure was causing heavy mucus build-up in his chest,

throat and nose and  minor  headaches. He sought to cease the use of vaping

products in the facility, and to be provided with a mask.  (*Id.*).  An investigation

determined Murray's claims to be completely unfounded.  (*Id.*; *Id.*)

On November 13, 2019, he signed up for sick call complaining of ongoing

mucus in his throat.  (*Id.* at 35; *Id.* at 35).  He informed Physician's Assistant

Devon Woolfolk ("PA Woolfolk"), that he was always clearing his throat, having

post-nasal drip and suffering from a cough.  He acknowledged that he has not tried

any medications, because he does not like taking them. Although he was not a smoker, he reported to PA Woolfolk that his symptoms were worse when he was around smoke.  He denied having a fever or chills, aches, ear pain, nausea or vomiting, abdominal pain, chest pain, shortness of breath, wheezing, headache, dizziness, sneezing, or itchy eyes.  PA Woolfolk's examination revealed that Murray's eyes, ears, mouth, tongue, and pharynx were normal.  His nose exhibited mild hypertrophy and slight clear congestion. (*Id.*; *Id.*).  His lungs showed no signs of wheezing, rhonchi, or rales.  (*Id.*; *Id.*).  PA Woolfolk explained that his symptoms were most consistent with rhinitis.  (*Id.*; *Id.*).  Murray refused to take any antihistamines but agreed to undergo screening bloodwork. (*Id.*; *Id.*).  The bloodwork completed on November 18, 2019, was normal.  (*Id.*; *Id.*).

During his August 23, 2018, deposition, Murray testified as follows:

a. He was not aware whether his family members suffered from any lung conditions.

b. He did not have a lung condition and never treated for one.

c.  He had no measuring device to determine the level of secondhand smoke at  SCI-Dallas, nor had he seen anyone using such a device at SCI-Dallas.

d.  He admitted that when his grievance was answered advising him to seek medical attention, he did not do so because there was no reason to seek medical attention.

e.  He admitted that he did not have a cellmate who smoked because he was designated as a "Z-Code", meaning single cell status.

(Doc. 134 ¶ 21; Doc. 157, ¶ 21).

## III.  <u>DISCUSSION</u>

### A.    **Defendant DeBoer**

1.    <u>Exhaustion of Administrative Remedies</u>

Defendant DeBoer first seeks the entry of summary judgment based on Murray's failure to properly exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997(e)a.  The PLRA "mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions."  *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016); *see Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000) ("[I]t is beyond the power of this court—or any other—to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis.").  "[T]o properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules,' rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citation omitted) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006).  Accordingly, a prisoner who fails to request monetary damages in the grievance process is barred from bringing a claim for monetary relief in federal court. *See Cunningham v. Zubsic*, 2019 WL 134209, at *5 (W.D. Pa. Jan. 8, 2019); *Wright v. Sauers*, 729 F. App'x 225, 227 (3d Cir. 2018). To "complete the administrative review process," means "substantial" compliance with the prison's grievance procedures. *See Spruill v. Gillis*, 372 F.3d

218, 231 (3d Cir. 2004) (citing *Nyhuis*, 204 F.3d at 77–78).

While the PLRA requires that prisoners comply with the procedural demands of a system created by their jailors, those jailors must also comply with the demands of the system they created. *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019).  Consequently, "[a]s soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement."  (*Id.*).

"The only limit to § 1997e(a)'s [exhaustion] mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'"  *Ross*, 136 S. Ct. at 1862 (quoting § 1997e(a)).  In other words, "the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id.* at 1858 (quoting § 1997e(a)).  "[T]he ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'"  *Id.* (quoting *Booth*, 532 U.S. at 737–38 (internal citations and quotation marks omitted)).  "Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 1859 (*Booth*, 532 U.S. at 738).

Defendant DeBoer is mentioned in Grievance Number 786403.  (Doc. 134, ¶ 25; Doc. 157, ¶ 25; Doc. 139-4, p. 19).  Therein, Murray describes his February 6, 2019, sick call appointment during which Defendant DeBoer diagnosed him with allergic rhinitis, a diagnosis with which he "vigorously disagreed." He closed the grievance with the following:  "Relief sought here:  I want to be examined by a ETS or indoor pollutant medical specialist, and also be provided with a duck-bill or painter's mask while housed in I-unit."  (Doc. 139-4, p. 19).  He sought the same relief in both his appeal to the Facility Manager and to the SOIGA. (Doc. 139-4, pp. 21, 23).  The DOC's Inmate Grievance System, set forth in DC-ADM 804, specifically provides that "[i]f the inmate desires compensation or other legal relief normally available from a court, the inmate must request the specific relief sought in his/her initial grievance."  (Doc. 139-3, p. 5).  Grievance Number 786403, the sole grievance in which Defendant DeBoer is named, is devoid of a request for any of the relief Murray seeks in his supplemental complaint.  (Doc. 139-4, p. 19; Doc. 79, pp. 9, 10).  He did not seek monetary relief, punitive damages, or request the type of declaratory or injunctive relief he seeks in his supplemental complaint. DeBoer is entitled to an entry of summary judgment.

      2.   <u>Merits</u>

Even had Murray properly exhausted, DeBoer would be entitled to summary judgment on the merits.  For the delay or denial of medical care to rise to a violation of the Eighth Amendment's prohibition against cruel and unusual

21

punishment, a prisoner must demonstrate "(1) that defendants were deliberately indifferent to [his] medical needs and (2) that those needs were serious." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).  Deliberate indifference requires proof that the official "knows of and disregards an excessive risk to inmate health or safety." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  Deliberate indifference has been found where a prison official: "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a nonmedical reason; or (3) prevents a prisoner from receiving needed or recommended treatment." *Rouse*, 182 F.3d at 197.  Deference is given to prison medical authorities in the diagnosis and treatment of patients, and courts "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . (which) remains a question of sound professional judgment." *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).  "Allegations of medical malpractice are not sufficient to establish a Constitutional violation," nor is "[m]ere disagreement as to the proper medical treatment." *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004).  A "failure to provide adequate care ... [that] was deliberate, and motivated by non-medical factors" is actionable under the Eighth Amendment, but "inadequate care [that] was a result of an error in medical judgment" is not. *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993*); Estelle v.*

*Gamble*, 429 U.S. 97, 105–06 (1976).

When Murray presented for treatment on February 6, 2019, DeBoer considered his symptoms and, after she conducted an examination, administered a diagnostic peak flow test, and evaluated his respiration rate and oxygen levels, she concluded that he suffered from allergic rhinitis.  She explained that his symptoms can be attributed to an irritative process from smoke exposure triggering mucous production as well as other symptoms and suggested a prescription for Zyrtec.  He declined the Zyrtec, commented that they should stop smoking on the block, and requested a mask.  DeBoer advised him that she had no authority to prevent other inmates from smoking or direct DOC staff to stop smoking and could not issue him a mask.  Pursuant to DOC regulations in effect at the time, and prior to COVID-19, inmates were not permitted to wear face coverings in the housing units, including medical masks.  (Doc. 139-11, ¶ 6).

The record demonstrates that DeBoer rendered adequate medical attention and treatment based on Murray's symptoms, complaints, and diagnostic tests and provided him a treatment option.  She explained her inability to resolve his housing situation or provide a mask based on constraints associated with her position in the medical department and DOC policies.  There is not a scintilla of evidence that Defendant DeBoer acted with deliberate indifference to Murray's medical needs. As such, even had Murray properly exhausted his administrative remedies, summary judgment would be entered in DeBoer's favor on the merits.

**B.    DOC Defendants**

The Eighth Amendment "requires that inmates be furnished with the basic human needs, one of which is 'reasonable safety'." *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (quoting *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 200 (1989)).  A prisoner may bring an Eighth Amendment claim for exposure to levels of ETS that pose an unreasonable risk of serious damage to the prisoner's future health.  *Helling*, 509 U.S. at 35.  "An inmate alleging such a violation can base his claim on either a present or future injury, both types involving an objective and subjective element.  In both instances, adoption of an anti-smoking policy "will bear heavily on the inquiry into deliberate indifference." *Helling*, 509 U.S. at 36.

1.    <u>Present Injury</u>

For a present injury case, a plaintiff must show (1) a sufficiently serious medical need related to the ETS exposure and (2) deliberate indifference by prison authorities.  *Atkinson*, 316 F.3d at 266.

Murray has failed to demonstrate that he suffers a sufficiently serious medical need related to ETS exposure.  During his August 23, 2018 deposition, he testified that he did not have a lung condition and never treated for one.  (Doc. 139-6, pp. 43-46).  He further testified that when he was advised in March 2017, *via* the grievance system, to seek medical attention if he was experiencing health

issues, he did not do so because there was no reason to seek medical attention. (Doc. 139-7, pp. 7-9).

He first sought medical attention related to ETS and attended sick call on February 6, 2019, almost seventeen months after he filed this action.  At that time, he was diagnosed with allergic rhinitis.  According to the record, allergic rhinitis is an allergy or irritative process from smoke exposure triggering mucous production as well as other symptoms, which is managed with an antihistamine prescription. Murray declined the prescription.

More than five months passed.  On August 6, 2019, he sought medical treatment for symptoms of constant heavy mucus/sputum build up in chest area and nostrils, and difficulty breathing during exertion.  When seen by Defendant DeBoer he denied having a cough and reported that the only time he experienced difficulty breathing was with extreme exertion such as running or playing basketball.  Following an unremarkable examination, administration of a diagnostic peak flow test, and assessment of respiration rate and oxygen levels, which were normal, Defendant DeBoer ordered a chest X-ray.  The chest X-ray revealed no acute radiographic evidence of acute cardiopulmonary disease.

On August 19, 2019, Murray requested a sick call stating that he suffered from chronic medical problems, regarding mucous build up in his nose, throat, chest and lungs and requested to see his X-ray results.  Defendant DeBoer

reviewed the X-ray results with him and explained that the films showed no evidence of pulmonary disease.  (*Id.*).

Another three months passed.  On November 13, 2019, he sought treatment for ongoing mucus in his throat.  At sick call, he informed PA Woolfolk that he was always clearing his throat, experiencing post-nasal drip, and suffering from a cough.  He indicated that his symptoms worsened when he was around smoke.  He denied having a fever or chills, aches, ear pain, nausea or vomiting, abdominal pain, chest pain, shortness of breath, wheezing, headache, dizziness, sneezing, or itchy eyes.  Upon examination, Murray's eyes, ears, mouth, tongue, and pharynx were normal, and his nose exhibited mild hypertrophy and slight clear congestion.  His lungs showed no signs of wheezing, rhonchi, or rales.  PA Woolfolk explained that his symptoms were most consistent with rhinitis.  Murray acknowledged that he has not tried any medications because he does not like taking them. He refused to take an antihistamine but agreed to undergo screening bloodwork, which yielded normal results.

Since the inception of this action in 2017, Murray has sought medical attention for ETS related symptoms on four occasions.  These requests came over the course of approximately nine months in 2019.  During that time, medical providers twice diagnosed him with allergic rhinitis.  The condition, which in Murray's case caused a runny nose, post-nasal drip, clearing of the throat, mucous build-up, and the occasional cough, is managed by an

antihistamine prescription.  Murray refuses to take the prescription.  A chest X-ray taken in August 2019, was normal.  Bloodwork drawn in November 2019, also spawned normal results.  Murray has failed to demonstrate a sufficiently serious medical need related to ETS exposure.  Hence, the DOC Defendants are entitled to an entry of summary judgment on the present injury claim.

2.   Future Injury

For a future injury case, a plaintiff must show (1) that 'the risk of which [plaintiff] complains is not one that today's society chooses to tolerate,' and (2) deliberate indifference by prison authorities.  *Helling*, 509 U.S. at 36, 113 S.Ct. 2475."  *Spellman v. Sec'y Pennsylvania Dep't of Corr*., 751 F. App'x 251, 253 (3d Cir. 2018).  To prove the objective element, the plaintiff must show that he himself is "being exposed to unreasonably high levels of [ETS] ." *Helling,* 509 U.S. at 35. Among the factors to be considered in evaluating this element are the "seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [ETS]," as well as "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Id.* at 36. To prove the subjective element, the plaintiff must demonstrate "deliberate indifference" on the defendants' part, taken "in light of the prison

authorities' current attitudes and conduct." *Id.*  Related to the subjective

element, defendants may raise "arguments regarding the realities of prison

administration." *Id* . at 37.

With regard to the objective element, Murray submits his own declaration

and  numerous declarations from smoking and non-smoking inmates who, at some

point during the relevant time frame, were also housed at SCI-Dallas.  (Doc. 156-1,

pp. 95-130).  The non-smoking inmates declare that it is virtually impossible for a

non-smoking inmate to be free of exposure to secondhand smoke at SCI-Dallas

where inmates are permitted to freely and openly smoke anywhere in the inmate

housing units.  (*Id.* at pp. 114-130).  Of the twelve smokers, seven executed a form

declaring "I am an inmate that consistently uses and/or consume[s] smoking

tobacco products" and "I have been allowed by staff to freely use/consume

smoking tobacco products (at any time and anywhere) in the inmate housing

units."  (*Id.* at 100-102, 105-108).  Several others indicate the same but specify the

block or unit where they are allowed to freely smoke, namely E, F, I and J Units,

and I block.  (*Id.* at 95-97, 103-104, 109-113).

Although the declarations indicate that some inmates freely smoked within

the housing units at SCI-Dallas, they do not demonstrate Murray was exposed to

unreasonably high levels of ETS such that it created a risk so grave that it violated

contemporary standards of decency. Per his declaration, there are multiple housing

units (he refers to at least 7) and each unit houses between 150 and 200 inmates.

(Doc. 156-1, p. 195, ¶¶ 8, 9).  Murray submitted declarations from only twelve smokers.

Further, the declarations provide no evidence of Murray's actual exposure to ETS.  None of the smokers declare that they regularly smoked in Murray's presence or that they were housed on the same unit or block as Murray.  Nor did any of them share a cell with Murray.  In fact, Murray never shared a cell with a smoker.  For the entirety of his stay at SCI-Dallas he was designated Z-Code, or single cell status.

*Helling* and *Atkinson* require more than what these declarations offer. Compare *Helling*, 509 U.S. at 35, 113 S.Ct. 2475 (holding that inmate, who bunked with cellmate who smoked five packs a day, was exposed to unreasonably high levels of ETS), and *Atkinson*, 316 F.3d at 264–65 (holding that inmate, who shared cell with two constant smokers for seven months, was exposed to unreasonably high levels of ETS), with *Richardson v. Spurlock*, 260 F.3d 495, 498 (5th Cir. 2001) (finding that sitting near smokers sometimes is not unreasonable exposure).  "*Helling* did not read the Eighth Amendment as mandating smoke-free prisons. It is impossible to read any such *per se* rule into Helling's 'objective' element." *Scott v. District of Columbia*, 139 F.3d 940, 942 (D.C.Cir.1998); *see*

*also Mills v. Clark*, 229 F.3d 1143, at *5 & n. 5 (4th Cir. 2000) (table) ("*Helling* does not guarantee plaintiff a smoke free environment").[2]

Murray's failure to submit evidence showing that he was exposed to unreasonably high levels of ETS compels an entry of judgment in favor of the DOC Defendants on the future injury claim.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, Defendants' motions (Docs. 133, 135) for summary judgment will be granted.

An appropriate Order will issue.

---

[2] Significantly, effective June 1, 2019, tobacco products are no longer available for purchase through the DOC facilities' commissaries and, effective July 1, 2019, all DOC facilities were converted to tobacco-free environments.  (Doc. 140-1, p. 2).